Filed 1/29/15  In re J.H. CA1/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| In re J.H., a Person Coming Under the Juvenile Court Law. | |
| SOLANO COUNTY HEALTH & SOCIAL SERVICES DEPARTMENT,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>C.H.,<br><br>        Defendant and Appellant. | A141018<br><br>(Solano County<br>  Super. Ct. No. J41522) |
| In re C.H.,<br><br>        on Habeas Corpus. | A142616 |

Following a hearing held pursuant to Welfare and Institutions Code section 366.26, [1] the juvenile court entered an order on February 14, 2014, terminating the parental rights of C.H. (father) with respect to his son J.H. and directing the Solano County Health & Social Services Department (the agency) to commence adoption proceedings for the child.  On appeal and in his consolidated petition for writ of habeas

---

[1]     All further unspecified statutory references are to the Welfare and Institutions Code.

corpus, [2] father does not present any substantive arguments challenging the juvenile court's findings or order entered after the section 366.26 hearing. He argues only that the February 14, 2014, order "was the inevitable product" of earlier antecedent orders entered after the jurisdictional and dispositional hearing, and the six-month and 12-month review hearings, which preceded the February 14, 2014 order. (*In re Meranda P.* (1997) 56 Cal.App.4th 1143, 1146 (*Meranda P.*).) According to father, each antecedent order was wrongly decided by the juvenile court or was the consequence of his counsel's ineffective assistance. We conclude father's failure to either appeal or seek writ relief regarding the propriety of the orders antedating the February 14, 2014, order precludes him from now challenging those orders either by this appeal or by petition for writ of habeas corpus. (*Ibid.*) Accordingly, we affirm the February 14, 2014, order and summarily deny father's petition for a writ of habeas corpus.

## FACTUAL AND PROCEDURAL BACKGROUND[3]

### A.     Jurisdiction and Disposition Orders

Mother gave birth to the child in May 2006. Father was present at the child's birth and is listed as the father on the child's birth certificate. Father and mother were not living together at the time of the child's birth. The parents have never been married and father reported he is married to another woman.

In June 2012, the agency filed a petition seeking to detain the child, who had just turned six, in an out-of-home placement pending further investigation and a jurisdictional hearing. The agency's intervention had been sought by a Fairfield police officer who had taken the child into protective custody when his temporary caretaker (mother's friend) was arrested and mother could not be found. In a detention report, the agency social worker stated that the child reported he had been living with his mother's friend for the

---

[2]     In support of his petition for writ of habeas corpus, appellant asks us to take judicial notice of the record, briefs and pleadings filed in the appeal in this case, which request is granted.

[3]     Because mother has not filed an appeal challenging the termination of her parental rights, our recitation of the facts focuses primarily, if not exclusively, on father's circumstances.

last 30 days and before that he had been living with his mother at a hotel. The child also reported that either his parents or his mother's friend took him to and from school each day. A.T., the child's adult-half sibling, reported that for the last three years, she and mother had been residing together on and off. In mother's absence, A.T. cared for the child. About one month before the child's detention, mother had arranged for the child to live with mother's friend. M.J., the child's maternal grandmother, reported that in about February 2012, mother began staying at a motel. At the end of April or beginning of May 2012, father had been arrested and was currently in the Yolo County jail. According to M.J., after father's arrest, "things went downhill even more because [father] had helped stabilize [mother] and that he was taking care of [his son] primarily. [M.J.] reported that [father] had kept [mother] away from drugs, steered her . . . on the right track, and ensured [his son] went to school." M.J. also explained her current circumstances and willingness to care for the child.

In its first amended petition, filed on July 2, 2012, the agency sought court intervention, alleging mother had failed to protect the child (§ 300, subd. (b)) based on her history of substance abuse, unstable housing, untreated mental health needs, and leaving the child with various caretakers without additional provisions for support, placing him at substantial risk of physical harm or illness, and father had failed to provide support for the child (§ 300, subd. (g)) based on the fact that father was "currently incarcerated" and "[d]ue to . . . father's absence, he cannot make appropriate provisions for [the child's] ongoing care and supervision which places the minor at substantial risk of serious physical harm or illness." After a hearing on July 3, 2012, the court continued the child's detention and scheduled a combined jurisdictional and dispositional hearing for July 24, 2012. In its findings and orders after detention hearing filed on July 3, 2012, the court found reasonable efforts were made to prevent or eliminate the need for the child's removal from the home and "[a] relative who is able, approved, and willing to care for the child is not available. *This is a temporary finding and does not preclude later placement with a relative under Welf. & Inst. Code, § 361.3.*" (Italics in original.)

3

In advance of the jurisdictional and dispositional hearing, the agency social worker filed a jurisdictional report on July 19, 2012. By that time the child had been placed with maternal relatives, provisionally approved by the agency. Based on an interview with father, the agency social worker reported the following information. Father asserted that since the child's birth he had provided financial support for the child and the day-to-day care for the child including taking the child to school every day. However, he admitted he had no knowledge of the arrangements mother had made for the child to stay with mother's friend. He was opposed to any plan to return the child to mother as she was not able to provide appropriate care. When father received the section 300 petition he was relieved to know the child had been removed from mother's care and was safe. Father explained the circumstances leading to his March 29, 2012 arrest on charges of evading a police officer and driving with a suspended license. Since father had been in police custody he had not seen the child. The agency social worker concluded her assessment of the father's situation as follows: Father "has expressed his deep love and concern for [the child]. [Father] has stated that were he not incarcerated, he would be able to make appropriate arrangements for the care of [the child], and has further stated that prior to his incarceration he ensured that [the child] was cared for, fed, and attended school. The outcome of his sentencing for his current incarceration is still unknown. As a result, there is, again, little alternative to the continued detention of the [child]."

At the originally scheduled jurisdictional and dispositional hearing on July 24, 2012, father was not present but was represented by a deputy public defender. The matter was continued for a month to allow counsel to speak with father in jail. At the continued hearing on August 24, 2012, father was again not present in court. The court was informed that there was an agreement "to resolve jurisdiction and potential disposition" at that time. Mother submitted to allegations, as amended, that she had failed to protect the child (§ 300, subd. (b)) based on a history of unstable housing, a past history of substance abuse, and untreated mental health needs, which periodically affected her ability to protect the child from physical harm and/or illness. Father's counsel told the court: "I did visit with [father] in custody in Yolo County. I advised

4

him of his right to be present today, but he had a court appearance scheduled at the same time up there, so he opted to stay up there. [¶] And as to the [section 300, subdivision (g), failure to provide support] allegation . . . , we did review that, and he was prepared to submit on that." Based on the agency's detention report and jurisdictional report, as well as the certified documents regarding the criminal proceedings against father, the court found by a preponderance of the evidence, that the allegations, as amended, against both parents were true, and accordingly, the child came within the jurisdiction of the court under subdivisions (b) and (g) of section 300. The court then discussed the terms and conditions of a disposition order. The court granted the agency's request that the child remain in an out-of-home placement with maternal relatives and both parents be granted reunification services. On August 29, 2012, the court issued its findings and order after jurisdictional hearing, and later, on September 7, 2012, issued its findings and order after dispositional hearing. The court declared the child a dependent after finding that, based on the facts stated on the record, (1) continuance of the child in the mother's home was contrary to his welfare and physical custody should be removed from mother, and (2) although father did not reside with the child at the time the petition was filed and desired custody of the child, "[b]y clear and convincing evidence, placement with the [father] . . . would be detrimental to the safety, protection, or physical or emotional well-being of the child." The juvenile court found father to be the presumed father of the child. The court granted both parents reunification services after finding, in pertinent part, that services to father would benefit the child. As to father's contact with the child, the court directed that father's "[i]n-person" visits "shall commence upon the father's release from jail. The father shall contact the Department upon his release to initiate visits," and "[t]elephone and written contact are permitted, as allowed by the relative caregiver. Letters containing inappropriate content may be returned to the writer." On January 15, 2013, the child was removed from the home of his maternal relatives at their request and moved to a foster family agency home.

5

## B.      Six-Month Review Hearing

In advance of the six-month review hearing, the agency social worker submitted a report indicating father had remained incarcerated in Yolo County for the duration of the current reporting period.  As to visits, the agency social worker reported:  "As [father] is currently incarcerated, he does not have in person contact with [the child].  He is allowed and encouraged to mail letters or cards to [the child] through the Department.  [Father] has mailed one letter to [the child] during the current reporting period.  The [agency social worker] is not recommending changes to [father's] visitation schedule."  The agency social worker further reported: "[Father] states that he needs to have contact with [the child].  He states that he wants in person visitation with [the child].  He would also like to have better access to services while he is incarcerated in Yolo County."

At the six-month review hearing held on February 26, 2013, father was not present.  Father's counsel stated he would "submit" on the matter, but was granted ten days to recalendar the matter because counsel had not heard from father and was not able to confirm if father had received the agency's report.  In its February 28, 2013, written findings and order entered after the six-month review hearing, the court continued its previous orders granting reunification services and directing that father's in-person visits with the child would commence on his release from incarceration and father was to contact the agency on his release to initiate visits.  On May 1, 2013, the child was moved from his foster care home placement to the home of his maternal grandmother.

## C.      Twelve-Month Review Hearing

In advance of the 12-month review hearing, the agency social worker filed its August 5, 2013, report, recommending termination of family reunification services for both parents.  As to the child's circumstances, the agency social worker reported that between January 15, 2013 and April 2013, the child had spent every weekend with his maternal grandmother in anticipation of placement in her home that occurred on May 1, 2013.  The child was adjusting well to his placement and enjoyed living with the maternal grandmother.  The maternal grandmother was committed to providing the child permanency in the form of adoption or guardianship, should reunification efforts with the

6

parents fail. Since March 2013, the child had weekly individual counseling sessions with a mental health therapist. The therapist reported the child was " 'bright and precocious,' " and " 'very, very smart and delightful.' " The child loved his maternal grandmother and " 'is ready to attach.' " The child was in need of healthy adult relationships and would easily attach to anyone with a strong presence in his life. The child expressed anxiety over not knowing what would happen to him, and this anxiety was manifesting as stomach aches and chest pains. The child wanted to live with his father, but if he could not do so he wanted to live with his maternal grandmother.

As to father's circumstances, the agency social worker reported that on June 26, 2013, father had been sentenced to more than seven years in prison, and therefore there was no substantial probability of return of the child to him within the next six months. The agency social worker reported father did not have in person visits with the child because of father's incarceration. Father sent letters and comic strips to the child who reportedly enjoyed the correspondence. The child asked the agency social worker to send father a school picture of child and on the back, the child had written that he loved his dad, and he and the maternal grandmother missed father a lot. The agency social worker opined that once father was assigned to permanent prison housing, the child would benefit from visits with father, provided the prison could arrange for contact visits and the decision was made in conjunction with the child's therapist.

The agency social worker concluded her report by commenting: Father "has attempted to engage in the few services he has access to while incarcerated in Yolo County. He sends letters to [the child] which [he] enjoys. [The child] misses [father] and painted a broken heart for him. However, [father] will be incarcerated for a significant portion of [the child's] childhood. There is no probability that [the child] can be returned to father within the next several years." The agency social worker included in her report certified documents relating to the criminal proceedings against father. The certified documents indicated that on June 26, 2013, pursuant to a plea agreement, father was sentenced to an aggregate term of seven years and four months for the felony offenses of "evading a peace officer with reckless driving" and "evading a peace officer while

7

driving in the opposite direction," that he waived presentence custody credit up to May 29, 2013, and he was granted credit for time served of 56 days.

The 12-month review hearing was ultimately held on September 16, 2013. Father was not present but was represented by a deputy public defender. The court stated it had read and considered the agency's report filed on August 5, 2013, and took judicial notice of the certified documents relating to father's criminal proceedings in Yolo County. When asked for father's position on the matter, his counsel replied that based on the information regarding defendant's seven-year sentence, counsel was prepared to submit. Based on the agency's recommendations, the court terminated reunification services for both parents and scheduled a section 366.26 hearing for January 7, 2014, to determine the child's permanent placement. In so ruling, the court explained: "The Court having read and considered the status review report does find at this point in time that [the child's] needs have become paramount . . . . [¶] . . . I am going to terminate reunification services for both [mother] and [father] at this point in time given their absence of compliance with the existing case plan, and in [father's] case, the fact that notwithstanding his effort to try to complete his case plan, his present prison sentence does not authorize the Department to extend services beyond the time in which he would otherwise be incarcerated, and the provisions of additional services would not be of benefit to the minor." With respect to visitation, the court ruled that "[w]hen [father] is settled in an appropriate facility, I'll direct the Department to inquire whether or not it's possible for them to arrange a special visit for [father] consistent with the rules and regulations of the facility in which he is incarcerated." In its written findings and order filed on September 19, 2013, the court directed that "in-person visitation shall be allowed at the discretion of the social worker in conjunction with the child's therapist while the father remains incarcerated, consideration being given to the rules and regulations of the penal institution. Should the father be released from custody, supervised visitation will occur at least once monthly," and "[w]ritten contact is permitted."

Father, in propria persona, filed a notice of intent to file a writ petition and request for record to review the September 19, 2013 order. However, this court struck the filing

of the record after father failed to timely file a writ petition. In our order, we stated that "[t]he failure to file a timely petition shall preclude any subsequent appellate review of the order setting a hearing under Welfare and Institutions Code section 366.26 (Welf. and Inst. Code, section 366.26, subd. (l))."

> ## D.      Section 366.26 Hearing

In advance of the section 366.26 hearing, the agency social worker filed a December 20, 2013, report, recommending termination of parental rights and adoption as the child's permanent placement plan. By that time, the child had been detained for 18 months and had been living with his maternal grandmother for seven months. The maternal grandmother had moved to a two-bedroom apartment and had retired from her employment. She was committed to adopting the child, providing him with a safe, stable home into adulthood, and supporting the child's contact with both parents as the child had stated that was important to him. If the maternal grandmother was not able to adopt the child, there were other family members who had expressed an interest in adopting the child. Father remained incarcerated. He maintained some contact with the child and was supportive of the child remaining in the care of the maternal grandmother. The agency social worker also reported on the child's circumstances. The child appeared comfortable and well-adjusted in the maternal grandmother's home, enjoyed living with her and wanted to stay there if he could not reunify with the parents. The child and father exchanged letters and had infrequent telephone calls. The child enjoyed his contact with father. The child had received counseling from March 2013 to August 28, 2013, when his case was closed after he showed significant progress. However, in December 2013, the agency social worker again referred the child for counseling after he began to show some serious anger and aggression when upset, expressing that he was angry because his mother had not visited him.

At the section 366.26 hearing held on February 10, 2014, the court heard testimony from father, the child's maternal grandmother, and the agency's reunification and adoption social worker assigned to the case. Both the agency's counsel and the child counsel's urged the court to follow the agency's recommendations and terminate the

9

parental rights of both parents after finding that the child was adoptable in general and by the maternal grandmother. Father's counsel argued that the court should select legal guardianship, rather than adoption, as the child's permanent plan on the ground father had met his burden of showing there was a compelling reason for finding that termination of parental rights would be detrimental to the child because father had maintained visits and contacts with the child to the best of his ability and the child would benefit from continuing the relationship. Counsel noted that legal guardianship would give the child stability because the child would not be moving and the maternal grandmother would be able to raise the child while father's parental rights would be maintained and kept intact.

The juvenile court found the agency had met its burden of demonstrating that the child's permanent placement plan should be adoption. In so ruling, the court explained: "[F]irst of all, it's uncontradicted here today that [the child] is adoptable, both generally and specifically. His grandmother very much wants to adopt him. And even if that were not to occur, the only evidence I have is that he'd be a very adoptable child, even without his grandmother there specifically indicating that she wanted to adopt him. [¶] Second, the only evidence I have, and I'll take judicial notice of the file I have, is that family reunification services were terminated for both . . . mother and . . . father back on September 16th, 2013. [¶] . . . [H]aving made those findings, that brings me to the exceptions to the adoption permanency plan that [father's counsel] has referred to . . . known as the [parental] beneficial relationship exception." The court found, however, that the parental beneficial relationship exception did not apply in this case for the following reasons: "[E]ach party in this case has focused in on the portions of the statute that, well, benefits their approach to this case. [¶] . . . I'm extremely pleased that everybody in this room has [the child's] best interests at heart. . . . [¶] . . . I want to do what's best for [the child.] [¶] These types of decisions are frequently not easy, and this is one of those times. . . . [¶] . . . What I have to decide is the application of the exception. And I note that the burden of proof is on [father] in that regard, the department having already met its burden [o]n the question of adoptability. [¶] . . . [A]s I understand the statute, there are two prongs. [¶] Prong one is that [father] has the burden of showing that

10

he had regular visitation and contact. I don't think that the evidence shows anything other than he hasn't. But as I understand his position, his position is that he hasn't had regular contact, but, well, it's not his fault. And I have some difficulty with that, [father]. I recognize that the department did not facilitate visitation and contact by you with [the child] while you were incarcerated in Yolo County, but . . . that's not their fault. . . . The fault is yours [because] you were incarcerated for mistakes that you made. And I recognize that this is a very heavy price to pay, maybe more than other people have to pay for their mistakes. [¶] The second prong is benefit to the child. And without a doubt, in my mind, I am perfectly sure that you love [the child] very much, and that he loves you. And . . . that's very important to me. [But] . . . . it has to be weighed against the benefit to [the child] of adoption. And in this particular case, it appears to me that [the child] does need that stability. [¶] And I recognize that during a portion of his life, you did have a parental role and an important parental role. But that hasn't been possible since you were incarcerated almost two years ago. And that's been lacking from [the child's] life. And he needs this. And you're going to be incarcerated for some time in the future, for a period of time in which none of us are clear exactly what that is. And as a result of that, you don't currently occupy a parental role. And, admittedly, that role has been given to [the maternal grandmother]. [¶] And I have to say, after seeing her testify and hearing her testimony, I can understand why you're comfortable with that and why [the child's] mother is comfortable with that, because, . . . she apparently is doing a very good job. [¶] I have to find that the beneficial relationship exception does not apply in this particular case, for the reasons that I've stated." The court further commented that its ruling concerned only the termination of father's "legal rights to make parental decisions for [the] child. Now I recognize that if that happens, it leaves [father] with no legal rights to force contact to occur that . . . [a] legal parent would have. But somehow, with this family, . . . at least right now, I don't hear anything like that . . . in this courtroom. [¶] I have to do what's right for [the child]. And in this particular case, I think what's right for him is that he needs that stability that his grandma is giving him. And as a result, I'm going to terminate the parental rights of both [parents], therefore leaving [the child]

11

available to be adopted by his grandmother." The court filed an order on February 14, 2014, embodying its section 366.26 findings. Father filed a notice of appeal challenging the February 14, 2014 order, and later filed a petition for writ of habeas corpus, which we consolidated with this appeal.

## DISCUSSION

In his appellate briefs and his petition, father essentially argues that all the findings and orders issued in this dependency proceeding starting with the jurisdictional finding against him should be reversed because of various errors made by the trial court and ineffective assistance of father's trial counsel. He argues that but for counsel's failure to object to the jurisdictional allegation against father, father's parental rights would not have been put into jeopardy because he could have demonstrated he was entitled to custody of the child and could have made alternative living arrangements for the child with the child's maternal grandmother. He also argues that but for trial counsel's failure to object to the lack of visits, it is reasonably likely that visits would have occurred, had such visits occurred his bond with the child could have been preserved and he might have been able to maintain and/or strengthen his relationship with the child and establish the parental beneficial relationship exception to the termination of his parental rights. He asks us to reverse the February 14, 2014 order, and remand the matter to the juvenile court with directions to reverse the findings and order made after the section 366.26 hearing, vacate all prior findings and orders affecting him, and hold a hearing, or if appropriate, a series of hearings, to which father would be entitled to notice and the right to appear and participate with assistance of counsel, at which time the court shall determine what findings and orders affecting father are appropriate and to grant such other and further relief as the trial court deems appropriate.

We conclude that father has forfeited for review his challenges to the findings and orders regarding jurisdiction and disposition, and the findings and orders made after the six-month review and the 12-month review hearings, for which he did not file either a notice of appeal or a writ petition. (See *In re Jesse W.* (2001) 93 Cal.App.4th 349, 355 [" '[a] challenge to the most recent order entered in a dependency matter may not

12

challenge prior orders for which the statutory time for filing an appeal has passed' "].)
"Given the state's strong interest in the expeditiousness and finality of juvenile
dependency proceedings (citation), the statutory scheme generally does not permit the
critical findings and orders made prior to the final setting of the 366.26 hearing to be
reopened and relitigated in an appeal from the order terminating parental rights. Nor can
the order setting the hearing itself, or any findings subsumed therein, be appealed unless
earlier writ review of any substantive claim was first sought and denied. (§ 366.26, subd.
(*l*).)" (*In re Zeth S.* (2003) 31 Cal.4th 396, 412-413, fn. omitted.)

Contrary to father's contention, we see no reason to apply "an exception" to the
forfeiture rule in this case "even though the issues raised involve the important
constitutional and statutory rights to . . . effective assistance of counsel." (*Meranda P.,
supra*, 56 Cal.App.4th at p. 1151.) "Enforcing the [forfeiture] rule against [father's]
representational claims does not infringe [his or his child's] due process rights. Three
elements must be assessed in order to determine ' "what due process requires" for
fundamental fairness, specifically, "the private interests at stake, the government's
interest, and the risk that the procedures used will lead to erroneous decisions." '
[Citations.] The interplay of these three factors favors application of the [forfeiture] rule
because, whatever benefits might accrue to the parent in the absence of the rule, the
resulting costs to the child and the state are 'greater.' [Citation.] Of the many private
and public concerns which collide in a dependency proceeding, time is among the most
important. [Citation.] The action ' "must be concluded as rapidly as is consistent with
fairness . . . ." ' [Citations.] The state's interest in expedition and finality is "strong."
[Citation.] The child's interest in securing a stable, 'normal,' home 'support[s] the state's
particular interest in finality.' [Citation.] To permit a parent to raise issues which go to
the validity of a final earlier appealable order would directly undermine these dominant
concerns of finality and reasonable expedition." (*Id*. at pp. 1151-1152, fn. omitted.)
"[A]t some point the interests of a parent, and therefore the correction of purported error
which operates to the detriment of the parent, must give way to the interest of the child in
a stable, secure, long-term, continuous home environment. Under California's

dependency statutes, this moment arrives when the juvenile court terminates reunification and sets a permanency hearing. [Citations.] At this juncture, the balance of the competing interests is tipped well towards the child; it is presumed the interests of the child and the natural parents have diverged and are inconsistent. [Citations.] Therefore, if a parent, for whatever reason, has failed to timely and appropriately raise a claim about the existence of quality of counsel received at a proceeding antedating the [section 366].26 hearing, we will apply the [forfeiture] rule to foreclose the parent from raising such an objection on appeal from the termination order." (*Id.* at p. 1160.) For similar reasons, we reject father's attempt to raise representational issues with respect to earlier final appealable orders in his petition for writ of habeas corpus. "[T]he rationale which supports our holding that the [forfeiture] rule should be enforced on the [parent's] appeal from the termination order applies equally to the [parent's] habeas corpus petition. The now paramount interests of the child in a stable, secure, long-term, continuous home environment and the associated interest of the state in reasonable expedition and finality, which have overcome the parent's interests in maintaining the family relationship, would be no less subject to subversion by a habeas petition than they would be by a direct appeal." (*Id.* at p. 1163; see *In re Carrie M.* (2001) 90 Cal.App.4th 530, 534 ["a claim of ineffective assistance of counsel in connection with jurisdiction and disposition orders . . . may not be raised by a habeas corpus petition filed in connection with an appeal from an order terminating parental rights"].)

Father's reliance on *In re Janee J.* (1999) 74 Cal.App.4th 198 (*Janee J.*) is misplaced. In that case, the court held the forfeiture rule "will be enforced unless due process forbids it." (*Id.* at p. 208.) But, in allowing for an exception to the forfeiture rule, the *Janee J.* court set forth the following guidelines: "First, there must be some defect that fundamentally undermined the statutory scheme so that the parent would have been kept from availing himself or herself of the protections afforded by the scheme as a whole. Lack of notice of . . . [writ] rights [is] one such example. . . . Second, to fall outside the [forfeiture] rule, defects must go beyond mere errors that might have been held reversible had they been properly and timely reviewed. To allow an exception for

14

mere 'reversible error' of that sort would abrogate the review scheme [citation] and turn the question of [forfeiture] into a review on the merits." (*Id*. at pp. 208-209.) Father has presented no defect that fundamentally undermined the statutory scheme so that he was prevented from availing himself of the protections afforded by the scheme as a whole. At most, father has alleged deficiencies that might have led to a finding of reversible error, which is not excepted from the forfeiture rule. (*Ibid.*) If father was concerned that his assigned trial counsel were not pursuing his interests, he could have asked for new counsel. (See *In re V.V.* (2010) 188 Cal.App.4th 392, 398 [juvenile courts allow "parents, who have a statutory and a due process right to competent counsel, to air their complaints about appointed counsel and request new counsel be appointed"].) Instead, father made not the slightest effort to inform the agency social worker or the juvenile court that he was unhappy with his assigned counsel at any time. Although father filed a notice of intent to file a writ petition challenging the order scheduling the section 366.26 hearing, he complains his counsel refused to file a writ petition. Had father brought the matter to the juvenile court's attention, however, the court could have rescheduled the section 366.26 hearing and extended father's time to file a writ petition if his concerns were found to be valid. "Instead, [father] chose to remain silent throughout the juvenile court proceedings." (*Meranda P., supra*, 56 Cal.App.4th at p. 1158.)

Accordingly, we conclude father has forfeited his arguments challenging any findings or orders filed antecedent to the February 14, 2014, order. Because father presents no substantive challenge to the February 14, 2014, order, terminating his parental rights and selecting adoption as the child's permanent plan, we shall affirm that order.

## DISPOSITION

The order filed on February 14, 2014, is affirmed. The petition for writ of habeas corpus is summarily denied.

_____
Jenkins, J.

15

We concur:

_____
McGuiness, P. J.


_____
Siggins, J.